## IN THE UNITED STATES DISTRICT COURT
## FOR THE SOUTHERN DISTRICT OF GEORGIA
## SAVANNAH DIVISION

DANIEL DEFENSE, LLC,

        Plaintiff,

      v.

THE TACTICAL EDGE, LLC,

        Defendant.

CIVIL ACTION NO.: 4:21-cv-334

## **O R D E R**

      This action stems from a failed agreement between Plaintiff Daniel Defense, LLC, and Defendant The Tactical Edge, LLC, ("Tactical Edge") to design and manufacture a new nine-millimeter pistol caliber carbine for Plaintiff to market and sell.  After the deal fell through, Plaintiff brought this suit against Defendant for breach of contract, fraud/fraudulent inducement, negligent misrepresentation (in the alternative), punitive damages, and attorney's fees.  (Doc. 1.) Defendant asserted counterclaims against Plaintiff for breach of contract, intentional misconduct, punitive damages, and attorney's fees.  (Doc. 10.)  There are three motions presently before the Court: (1) Defendant's Partial Motion for Summary Judgment as to its counterclaim for breach of contract and Plaintiff's breach of contract and fraud claims,[1] (doc. 37); (2) Plaintiff's Motion for Partial Summary Judgment as to its breach of contract and fraud claims and Defendant's counterclaims, (doc. 38); and (3) Plaintiff's Motion for Sanctions, (doc. 39).  For the reasons set forth below, the Court **DENIES** Defendant's Partial Motion for Summary Judgment, (doc. 37);

---

[1]  Defendant concedes that, while its Motion is styled as a "Motion for Summary Judgment," it is more appropriately titled, "Partial Motion for Summary Judgment" because it has not sought summary judgment on all of its counterclaims.  (Doc. 51, p. 6.)  Therefore, the Court henceforth will refer to Defendant's Motion as its "Partial Motion."

**GRANTS in part and DENIES in part** Plaintiff's Motion for Partial Summary Judgment, (doc.

38), and **GRANTS in part and DENIES in part** Plaintiff's Motion for Sanctions, (doc. 39).

## BACKGROUND

### I.  Factual History

#### A.  Plaintiff Approaches Defendant About Working Together to Design and Manufacture a Plaintiff-Branded PCC Firearm

The parties are manufacturers of firearms and firearm accessories.  (Doc. 46, pp. 1–2.)  In

June 2020, Plaintiff contacted Defendant and expressed its desire to bring a Plaintiff-branded 9mm

Pistol Caliber Carbine firearm ("PCC") to market, which Plaintiff had not sold previously.  (Id. at

pp. 2–3.)  Plaintiff reached out to Defendant because Defendant already produced a nine-

millimeter PCC.  (Id. at p. 2.)  From their early discussions, the parties understood that Plaintiff

sought to produce a PCC which incorporated a rear-charging handle, accepted Glock-style 9mm

magazines, and featured a last round bolt hold open ("LRBHO").  (Id. at p. 3.)  For the project,

Defendant would design and manufacture component sets consisting of the lower and upper

receiver, LRBHO, gas buffer, and hammer, while Plaintiff would provide the armbrace, grip,

charging handle, railing, and barrel.  (Doc. 38-21, p. 1; doc. 44-1, p. 1.)

About a month after being contacted by Plaintiff, Defendant sent Plaintiff a sample firearm.

(See doc. 46, p. 3.)  According to Robert Snyder, Defendant's CEO, the sample firearm was

functional, but Defendant wanted to improve the efficiency of the LRBHO mechanism.  (Doc. 38-

4, pp. 7–8.)  On November 18, 2020, representatives of Defendant visited Plaintiff to further

discuss the project.  (Doc. 37-3, p. 8; doc. 37-5, pp. 7–8.)  According to Gaetano Noriega,

Defendant's lead engineer for the project, Plaintiff indicated during the meeting that it was going

to use factory magazines from Glock in the PCC.  (Doc. 37-5, p. 10.)  Ultimately, Plaintiff gave

Defendant permission to produce fifty component sets as part of the project.  (Doc. 46, p. 6.)

For the next five or six months, Defendant worked on the project without a formal purchase order (frequently, "PO") or payment.  (Id. at pp. 6–7; see doc. 37-3, p. 10.)  Noriega testified that the parties met virtually "pretty regularly," or almost every Monday.  (Doc. 37-5, pp. 16–17.)  According to Noriega, in January or February 2021, Plaintiff informed Defendant that the PCC would have to function with Magpul PMAG magazines, which are a different brand of Glock-style magazine.  (Id. at p. 11; see also doc. 38-14, p. 2 (explaining that "Glock-style magazine" refers to a magazine that is designed to function in a Glock handgun, and stating that "Glock-style magazines" are produced by various manufacturers, including Glock and Magpul).)  Noriega testified that it became clear to him then that "it was going to be a difficult engineering problem to work with the PMAG[s]."  (Doc. 37-5, p. 11.)  He explained that he had to alter the PCC's design to be compatible with PMAGs, which then caused issues with the LRBHO.  (Id. (stating that opening up the magazine well "to accept the [wider] PMAGS" allowed the magazine to be "inserted fully further than . . . intended," causing it to bump into and bend a component of the LRBHO); see also doc. 37-3, p. 20 (Snyder testifying that, "If we want to move the [LRBHO] now ten thousandths to the right to try to work with a PMAG, well, now we have to shorten the lever on the [LRBHO] ten thousandths. . . .  It's a domino effect").)

**B.      PO #1 and Plaintiff's Visit to Defendant**

On April 9, 2021, Plaintiff sent Defendant a PO for 50 lower assemblies, 50 upper receivers, 50 9mm bolt carrier groups, 50 9mm hammers, and 25 9mm rifle buffers for the total price of $19,890.50 ("PO #1").  (Doc. 46, p. 7; see doc. 37-4, pp. 98–102.)  According to Roger Mustian, Plaintiff's Chief Financial Officer, PO #1 was "for the initial component sets for initial configuration and function first article inspection testing."  (Doc. 37-4, p. 10; see doc. 46, p. 7.)  PO #1 listed the "Required Recv Date" of these articles as June 25, 2021.  (Doc. 37-4, p. 98.)

Plaintiff admits that some of the goods were delivered but denies that they were conforming or functional.  (Doc. 46, pp. 7–8.)

On April 29, 2021, Brent Vergakis, Plaintiff's Director of Procurement, visited Defendant. (Doc. 38-4, pp. 8, 10; doc. 53-1, p. 1.)  During the visit, Defendant gave a Power Point presentation to Vergakis.  (Doc. 38-4, p. 14; doc. 38-1, p. 2.)  The Power Point, which is titled "Overview of The Tactical Edge," contained a bullet point on a slide titled "Project Plan" that read "[h]ave 500 units ready 30 days before deadline." (Doc. 38-1, p. 13.)  According to an internal e-mail summarizing the visit sent the following day, Vergakis stated that "[t]he number one hurdle that has had [Defendant] on hold" is confirmation about the type of rails Plaintiff planned to use for the gun.  (Doc. 37-4, p. 111.)  The e-mail provides that Defendant has also been "waiting for [Plaintiff] to supply [it] with barrels for test firing" and that the "silence from [Plaintiff's] end on when [Defendant] will be receiving barrels and rails has [it] wondering what is going on with [Plaintiff]."  (Id.)  Vergakis also asked, "Which magazines are we going with[?] . . . [Defendant] says the Magpul Gen 2 mags work much better than the Gen 1, so we shouldn't have any issues with the Gen 2 if we can't get Glock."  (Id. at p. 112.)  Vergakis stated that, per the parties' discussions, Defendant intended to ship 700 component sets to Plaintiff "no later than June 28th," with a "similar plan" for July and August.  (Id.)  The e-mail additionally noted Defendant's "current capacity" to be "700 a month," and it would have to "procure more machines to go beyond that," but that it was comfortable doing so.  (Id.)  In closing, Vergakis indicated that Defendant expressed concerns about Plaintiff not being fully engaged, that Defendant informed him it had rejected other work to support the project and had built up its inventory to have machine time for Plaintiff, and that its machines were waiting on Plaintiff.  (Id.)

### C.   PO #2 and the LOI

In May, Defendant requested a PO for 2,100 component sets. (Doc. 38-21, p. 2; doc. 44-1, p. 2.) On May 5, 2021, Plaintiff sent Defendant a PO for the purchase of 2,100 lower assemblies, 2,100 upper receivers, 2,100 9mm bolt carrier groups, 2,100 9mm hammers, and 2,100 9mm rifle buffers for the total price of $865,221.00 ("PO #2"). (Doc. 46, pp. 9–10; see doc. 37-4, pp. 103–07.) PO #2 split the total order into three equal delivery installments of 700 of each of the parts. (Doc. 37-4, pp. 103–04.) The order lists the "Desired Recv Date" of each installment as June 28, July 28, and August 27, 2021. (Id.) Plaintiff pre-paid $302,827.25 for the component sets ordered in PO #2. (Doc. 46, p. 10.)

PO #2 contains Plaintiff's standard terms and conditions. Paragraph 6 of the terms and conditions states that Plaintiff "may, at its election, by delivery to [Defendant] of written notice of termination, cancel this [PO] or any part hereof . . . if [Defendant] fails to deliver the Goods in accordance with any delivery or performance dates specified herein." (Doc. 37-4, p. 106.) Paragraph 5 states that "[a]ny [g]oods not in compliance with any specifications or other requirements of this [PO] are subject to rejection by [Plaintiff]." (Id.)

On May 13, 2021, the parties executed a "Letter of Intent" ("LOI") which states that the parties desire to work together to create a Plaintiff-branded PCC firearm. (Id. at pp. 96–97.) Pursuant to the LOI, Plaintiff "will purchase Tactical Edge Component Sets from [Defendant] via purchase orders" dictating the actual amount of component sets purchased. (Id.) Pertinently, the LOI provides that Defendant "has requested that [Plaintiff] pre-pay on its first purchase order," but "[Defendant] agrees to return the pre-paid funds, if [Plaintiff] is unable to deliver the ordered components in purchase order." (Id. at p. 97.) The LOI further states that "[t]ime is of the [e]ssence for both parties," and that Defendant "agrees to be bound by the Terms and Conditions in the Purchase Order." (Id.)

**D.      Communications Identifying Issues with Parts Received by Plaintiff**

On June 8, Noriega e-mailed Plaintiff stating, "I was unable to meet the original deadline of shipping the uppers and lowers out today.  I ran new parts today to correct the defects annotated in the visual standard which we received today but was unable to meet the cut off for shipping. . . .  We will ship theses [sic] out tomorrow."  (Doc. 53-1, p. 3.)  A month later, on July 8, Vergakis (apparently following Plaintiff's receipt of the parts) e-mailed Noriega, stating as follows: "Quality reviewed these parts this morning and added a couple more pictures that they would reject these parts on for production, please review the additional photos added to this [P]ower [P]oint."  (Doc. 53-1, p. 4; see id. at pp. 5–11 (pictures with text and markers identifying various issues with the design of the components).)  The Power Point indicates that various components were mismatched and contained "tool marks."[2]  (Id. at pp. 5–11.)  Then, presumably after Defendant sent a set of upper and lower receivers to address the issues identified in the Power Point, Vergakis sent an e-mail to Snyder on July 19, 2021, stating, "[S]ome items in the Power[ ]Point were addressed and some were not.  So we'll put together another slide show of what still needs to be addressed and send that out."  (Id. at p. 12.)

**E.      Plaintiff Inspects Defendant's Facility, Conducts Testing, and Helps Redesign Certain Components of the PCC**

On July 27, 2021, Cathy Nicholson, Plaintiff's "Supplier Quality Engineer" and Pierce Osborn, one of Plaintiff's engineers, visited Defendant to inspect its facility and processes.  (Doc. 46, p. 11; see doc. 37-8, p. 3; doc. 38-14, p. 1.)  Shortly before the visit, Nicholson e-mailed Snyder stating that the purpose of the visit was to observe the inspection processes for the parts Defendant was manufacturing and the parts Defendant was receiving from other manufacturers and to "[g]o

---

[2]  The term "tool marks" is not defined but, based on the pictures in the Power Point, they appear to be blemishes or physical imperfections on the surface of the parts generated during the manufacturing process. (See generally doc. 53-1, pp. 5, 6, 9, 11.)

over [Plaintiff's] expectations as far as visual." (Doc. 37-4, p. 108.) Mustian testified that, to the best of his knowledge, Nicholson performed these tasks. (Id. at p. 12.) Osborn accompanied Nicholson to conduct testing and to figure out issues Defendant was having with the magazine and the LRBHO. (Doc. 37-7, pp. 10–11; doc. 37-5, pp. 10–11, 15–17; see also doc. 38-3, p. 10 (Osborn worked with Noriega in the office for a couple days "on something with the design of the gun").) Osborn was there for "two full work weeks." (Doc. 37-7, p. 10.) According to Osborn, the computer-generated models that Defendant had for the PCC were not in usable form, so he took some information from the model to create a model which could be manipulated, worked with, and used to update the machine used to manufacture the components. (Id. at p. 11; see id. at pp. 10–11.) Noriega testified that, after that model was completed, Defendant produced some new samples of the magazine receiver and sent them to Plaintiff. (Doc. 37-5, p. 15.)

### E.  The August 26, 2021, Meeting and Subsequent Events Culminating in Plaintiff's Decision to Cancel PO #2

Osborn testified that, during an informal shooting session on August 20, 2021, the component sets Plaintiff received from Defendant (when assembled into functioning PCCs) failed in multiple ways; for instance, the LRBHO frequently failed to lock when appropriate. (Doc. 38-14, pp. 1–2.) An internal e-mail from Vergakis dated August 24 states that "[Osborn] sent an e-mail to [Noriega] and [Snyder] on Friday saying the gun still doesn't work with the latest changes you made and probably needs design changes on the internals for it to work." (Doc. 53-1, p. 14.) The record contains a Power Point created by Plaintiff that is also dated August 24, titled "PCC Plan and Options." (Doc. 37-4, pp. 119–24.) The presentation states that, "[t]o date, [Defendant] has failed to deliver [one] set of functioning parts," the "[c]urrent [d]esign does not work (LRBHO does not function)," and there is "[n]o chance [Defendant] could hit our [q]uality, [c]apacity, or [s]chedule requirements." (Id. at p. 120.)

On August 26, the parties had a meeting. (Doc. 46, p. 12; doc. 37-3, pp. 28–29.) Defendant states that the purpose of the meeting was "to revise the operative agreements to get the project back on track," while Plaintiff contends that the meeting was precipitated by Defendant's breach of the existing contracts. (Doc. 46, p. 12.) During the meeting, Defendant agreed to, *inter alia*, supply two fully functioning prototypes by September 30, 2021, ten complete component sets, test data, and to work with Plaintiff's legal team to assess potential patent infringement issues with the prototype.[3] (Doc. 37-3, p. 29; doc. 37-4, pp. 115–117.) The afternoon of the meeting, Jason Lovett, Plaintiff's VP of Operations, sent Snyder an e-mail summarizing the "conclusion and actions agreed upon" during the meeting. (Doc. 37-4, pp. 116–117.) The e-mail states that the parties were amending PO #2 "due to [Defendant] not meeting the delivery schedule and missing the window of time forecasted to maximize [Plaintiff's] revenue potential while time was of the essence." (Id.) According to the e-mail, Plaintiff agreed to revise the quantity in PO #2 from 2,100 units to 763 units for delivery on December 1, 2021, but that, "[i]f the requirements and schedule of deliveries are not met as defined above, then [Plaintiff] will terminate its partnership with [Defendant] immediately." (Id.) In other words, the parties agreed that Plaintiff would terminate its partnership with Defendant if Defendant failed, by September 30, to deliver two fully functioning prototypes, ten complete part sets, and test data, or failed to rule out that intellectual property legal exposure existed. (Id.) Finally, Lovett's e-mail states that Plaintiff "reserves all rights as previously entered upon in the [LOI]" and under PO #2, "originally and as amended to 763 units." (Id. at p. 117.) Snyder responded by e-mail the following day, confirming that,

---

[3]   Plaintiff was concerned that the LRBHO—which Defendant had purchased from a third-party manufacturer, Freedom Ordinance—infringed two federal patents. (Doc. 38-1, p. 3; see doc. 37-3, pp. 3, 17.) According to Mustian, Plaintiff contacted a patent attorney, who gave an oral opinion that infringement existed. (Id.; see doc. 38-16, pp. 1–2 (testimony of patent attorney that the prototype unit that Defendant provided Plaintiff "would infringe the claims of at least two United States Patents").)

"[Defendant] will be delivering 2 working, functioning models, [will] perform testing and send 10 complete part sets," and also will "provide all test data, including testing of 3 different brands of magazines." (Id. at p. 115.)

On September 2, Snyder e-mailed Lovett telling him that Defendant had four "100% functioning[] test guns ready" and requesting ammunition to test them. (Doc. 38-19.) Lovett responded that the ammunition had already been shipped and should be arriving the following day. (Id.) Osborn testified that Defendant sent Plaintiff a component set in September 2021 that purportedly would fix the existing problems. (Doc. 38-14, p. 2; see doc. 53-2, p. 18 (PowerPoint produced by Plaintiff indicating that the "[s]econd complete PCC weapon arrived in the rifle configuration" on September 22).) Osborn further testified that he tested the unit by loading ten different magazines (some of which were PMAG while others were Glock OEM) with a single round, inserting the magazine into the PCC, closing the bolt, and firing the round. (Doc. 38-14, p. 2.) Osborn stated that he repeated this test as outlined multiple times and recorded the results of the tests on shoot sheets. (Id.; see id. at pp. 6–7 (copies of shoot sheets).) The shoot sheets indicate that the LRBHO mechanism functioned only 13 times out of 40 attempts. (Id. at p. 6–7.)

Subsequently, on October 20, Snyder e-mailed Lovett stating

Here are videos showing the PCC functioning perfectly with the new LRBHO plate. I'd like another 30 days to get you a working gun. That[']s all I ask. We have more skin in this deal than [Plaintiff]. We went through MONTHS of playing the he said – she said game. 30 days is fair.

(Doc. 38-15.) Snyder testified that, at this point, the LRBHO "wasn't working as intended," and he wanted to provide Plaintiff a gun with an LRBHO mechanism that worked 100% of the time, including when the magazine was slammed into the lower receiver.[4] (Doc. 37-3, p. 16.) Indeed,

---

[4] Snyder testified that the issues with the LRBHO were caused by Plaintiff "slamming the magazine" into the lower receiver in an "improper fashion," causing the LRBHO plate to bend. (Doc. 37-3, p. 20; see id.

Osborn testified that Plaintiff did not receive any component sets from Defendant on or prior to October 20 that could be integrated into a saleable firearm, citing failures such as an easily bent/warped top plate, a bolt catch that over-traveled the follower in the magazine, and bolt-catch failure due to bending at the weld near the rear charging handle.  (Doc. 38-14, p. 3; <u>see also</u> doc. 38-1, p. 3 (Mustian's testimony that, "[a]s of October 20, 2021, [Plaintiff] had not received a single component set from [Defendant] that functioned adequately")).)  Osborn further testified that several of these failures, including the firearms' tendency to bend at the internal weld, were not related to the insertion force of the magazine.  (Doc. 38-14, p. 3.)

> The afternoon of October 20, Justin Ward, Plaintiff's VP of Legal, e-mailed Snyder stating
>
> As we discussed in our meeting earlier today, . . . [Defendant] has been unable to perform its contractual obligations to [Plaintiff] for delivery of the component parts required for the development of a [Plaintiff] branded [PCC] firearm. . . .  [I]t is now clear that . . . [Defendant] does not have the capacity and resources needed to produce the parts in the quantities and to the quality requirements of [Plaintiff's] purchase orders and specifications.  Accordingly, this e-mail will constitute written notice of termination pursuant to Paragraph 6 of the Standard Terms and Conditions of the . . . [POs] issued pursuant to the May 13, 2021 [LOI] . . . ."

(Doc. 38-18, pp. 1–2.)  The e-mail further declares that Defendant "failed to manufacture and deliver the parts listed in the [POs] in accordance with specified schedules" and failed to "deliver parts that make a reliable working firearm as called for by [Plaintiff]."  (<u>Id.</u> at p. 2.)  Additionally, the e-mail states that, notwithstanding Plaintiff's allowance of additional time for Defendant to demonstrate its ability to produce fully functioning prototypes and complete component sets, Defendant failed to do so and also "failed to procure for [Plaintiff] the right to continue using parts that infringe upon the patent of others after receiving notice from [Plaintiff] of that infringement."

---

at pp. 20–22.)  Snyder testified that this belief was based off a video Plaintiff sent Defendant of Plaintiff inserting the magazine.  (<u>Id.</u> at p. 22.)

(Id.)  Finally, the e-mail demands the return of $302,827.25 in pre-paid funds advanced to Defendant pursuant to the LOI.  (Id.)

### F.   Additional Testimony Concerning Defendant's Performance and the Parties' Communications throughout the Project

Vergakis testified that Defendant sent Plaintiff fewer than thirty component sets of upper and lower receivers over the course of the project.  (Doc. 53-1, p. 1.)  Vergakis stated that these sets were sent in iterations: Plaintiff would inform Defendant that the completed component sets it received were defective, reject them, and inform Defendant of the problems with the received sets.  (Id.)  Thereafter, Defendant would send new upper/lower receivers for Plaintiff to evaluate. (Id.)   According to Vergakis, the parties held weekly videoconference meetings, in which Plaintiff's personnel informed Defendant that the latest complete component sets were nonconforming, rejected, and could not be accepted.  (Id. at pp. 1–2.)  Additionally, as referenced previously, Plaintiff provided Defendant with Power Points containing pictures and diagrams describing issues with the components it had received.  (See, e.g., id. at pp. 5–11; doc. 53-2, pp. 5–20.)  Noriega confirmed, through his testimony, that the parties met regularly on Mondays. (Doc. 37-5, pp. 16–17.)

## II.   Procedural History

Approximately one month after canceling PO #2, Plaintiff initiated this action against Defendant.  (Doc. 1.)  The Amended Complaint asserts claims for breach of contract (Count I); fraud/fraudulent inducement (Count II), and, in the alternative, negligent misrepresentation (Count III); punitive damages (Count IV); and attorneys' fees (Count VI).  (Doc. 36.)  The crux of Plaintiff's claims is that Defendant misrepresented its expertise and capacity to produce functioning component sets in a timely manner and breached the agreement to supply Plaintiff with conforming sets by the prescribed deadlines.  (Id.)  Plaintiff seeks to recover the $302,827.25

11

it pre-paid to Defendant towards the goods ordered in PO #2, as well as $250,000.00 in punitive damages, and attorneys' fees.  (Id. at p. 10.)  Defendant filed an Answer and Counterclaims, asserting the following counterclaims against Plaintiff: (1) Breach of Contract (Count I); (2) Intentional Misconduct (Count II); (3) Punitive Damages (Count III); and (4) Attorneys' Fees (Count IV).  (Doc. 10.)  Defendant alleges that it fulfilled its obligations under the POs, that Plaintiff breached the parties' agreement by refusing to pay in full, and that Plaintiff has intentionally engaged in a scheme to extract proprietary designs and processes from it without compensation.  (Id.)

The parties filed their respective Partial Motions, (docs. 37, 38), and Plaintiff filed its Motion for Sanctions, (doc. 39).  Defendant requests summary judgment in its favor on its own breach of contract counterclaim and against Plaintiff on Plaintiff's breach of contract, fraud/fraudulent inducement, and negligent misrepresentation claims. (Doc. 37-1.)  Plaintiff seeks summary judgment in its favor on its claims for breach of contract and fraud and against Defendant on Defendant's counterclaims for breach of contract, intentional misconduct, punitive damages, and attorneys' fees.  (Doc. 38.)  Plaintiff moves for sanctions for Defendant's failure to disclose complaints it received about its products during discovery which, Plaintiff contends, are highly relevant to Plaintiff's fraud-based claims.  (Doc. 39.)

## STANDARD OF REVIEW

Summary judgment "shall" be granted if "the movant shows that there is no genuine dispute as to any material fact and that the movant is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(a).  A fact is "material" if it "might affect the outcome of the suit under the governing law."  FindWhat Inv'r Grp. v. FindWhat.com, 658 F.3d 1282, 1307 (11th Cir. 2011) (quoting

Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986)).   A dispute is "genuine" if the "evidence is such that a reasonable jury could return a verdict for the nonmoving party." Id.

The moving party bears the burden of establishing that there is no genuine dispute as to any material fact and that it is entitled to judgment as a matter of law.  See Williamson Oil Co. v. Philip Morris USA, 346 F.3d 1287, 1298 (11th Cir. 2003).  Specifically, the moving party must identify the portions of the record which establish that there are no "genuine dispute[s] as to any material fact and the movant is entitled to judgment as a matter of law." Moton v. Cowart, 631 F.3d 1337, 1341 (11th Cir. 2011).  When the nonmoving party would have the burden of proof at trial, the moving party may discharge his burden by showing that the record lacks evidence to support the nonmoving party's case or that the nonmoving party would be unable to prove his case at trial. See id. (citing Celotex Corp. v. Catrett, 477 U.S. 317, 322–23 (1986)).  If the moving party discharges this burden, the burden shifts to the nonmovant to go beyond the pleadings and present affirmative evidence to show that a genuine issue of fact does exist.  Anderson, 477 U.S. at 257.

In determining whether a summary judgment motion should be granted, a court must view the record and all reasonable inferences that can be drawn from the record in a light most favorable to the nonmoving party.  Peek-A-Boo Lounge of Bradenton, Inc. v. Manatee Cnty., 630 F.3d 1346, 1353 (11th Cir. 2011) (citing Rodriguez v. Sec'y for Dep't of Corr., 508 F.3d 611, 616 (11th Cir. 2007)).  Accordingly, in considering Plaintiff's motion for summary judgment, the Court will view the facts in the light most favorable to Defendant, and in considering Defendant's motion, the Court will view the facts in the light most favorable to Plaintiff.  See Am. Bankers Ins. Grp. v. United States, 408 F.3d 1328, 1331 (11th Cir. 2005).  However, "facts must be viewed in the light most favorable to the nonmoving party only if there is a 'genuine' dispute as to those facts." Scott v. Harris, 550 U.S. 372, 380 (2007).  "[T]he mere existence of some alleged factual dispute

between the parties will not defeat an otherwise properly supported motion for summary judgment; the requirement is that there be no genuine issue of material fact." <u>Id.</u> (citation and emphasis omitted).  Nonetheless, "[c]ross-motions for summary judgment will not, in themselves, warrant the court in granting summary judgment unless one of the parties is entitled to judgment as a matter of law on facts that are not genuinely disputed." <u>United States v. Oakley</u>, 744 F.2d 1553, 1555 (11th Cir. 1984) (citation omitted).

## DISCUSSION

### I.     Plaintiff's Breach of Contract Claim (Count I of the Amended Complaint)

Count I of the Amended Complaint alleges that Defendant breached the parties' agreement by failing to produce conforming component sets and inspection data.  (Doc. 36, pp. 6–7.) According to Plaintiff, the deficiencies in the design and manufacturing of the components did not meet the quality and performance standards agreed upon by the parties and rendered the prototype PCC firearms inoperable and unfit for sale under Plaintiff's brand.  (<u>Id.</u>)  Both parties request summary judgment as to this claim on various grounds.

The elements of a breach of contract claim in Georgia are "(1) a valid contract; (2) material breach of its terms; and (3) damages arising therefrom." <u>Brooks v. Branch Banking & Tr. Co.</u>, 107 F. Supp. 3d 1290, 1295 (N.D. Ga. 2015).  Article 2 of the Uniform Commercial Code ("UCC"), as adopted in Georgia, applies to contracts for the sale of goods.  O.C.G.A. § 11-2-102. The parties agree that they entered a valid contract for Defendant to sell component sets to Plaintiff for its PCC firearm and that the contract is governed by Georgia's UCC, O.C.G.A. § 11-1-101, *et seq*.  (Doc. 38, p. 17; doc. 44, p. 7.)  Their disagreement centers around the second element (breach).

Plaintiff argues, *inter alia*, that summary judgment is warranted on Count I because Defendant failed to deliver any working units by the delivery deadlines, and it therefore was entitled to cancel PO #2 and recover its prepayment pursuant to both Georgia law and the parties' contract.  (Doc. 38, pp. 17–19.)  Defendant argues in response that the purported "deadlines" in PO #2 were merely "desired" dates of receipt and that "the record shows the design was a moving target" for a product "still under development."  (Doc. 51, p. 3; see doc. 44, p. 8.)

For its part, Defendant requests summary judgment on Count I on the grounds that it *would have* performed all work required under PO #2 and *would have* delivered conforming goods by the modified deadline of December 1, 2021, if Plaintiff had not unilaterally terminated their relationship.  (Doc. 37-1, pp. 7–8.)  According to Defendant, "[a]lthough [it] did continue to work and deliver goods up until Plaintiff's unilateral termination on October 20, 2021, [it] was never given the opportunity to fully deliver and perform."  (Id. at p. 8.)  Plaintiff contends that there is no genuine dispute that Defendant failed to meet the conditions necessary to trigger the revised PO #2 for 763 units due December 1, and therefore Defendant cannot rely upon it.  (Doc. 45, pp. 8–12.)  For the reasons stated below, summary judgment is not warranted in either party's favor on Count I.

### A.    Plaintiff's Argument that Defendant Failed to Deliver Functioning Component Sets by PO #2's "Deadlines"

Plaintiff contends there is no genuine dispute that Defendant breached PO #2 by failing to deliver any working component units by June 28, July 28, and August 28, much less the 700 units per deadline specified therein.  (Doc. 38, pp. 17–19.)  Plaintiff argues that it was authorized to cancel under Paragraph 6 of PO #2 and O.C.G.A. § 11-2-711 because Defendant did not deliver conforming sets by these dates, (id.), which Plaintiff repeatedly refers to as "deadlines," (see generally docs. 38, 45, 50).  Defendant does not contend or cite to evidence that it delivered

conforming component sets by the dates listed in PO #2.  (<u>See generally</u> docs. 37-1, 44, 51.) Indeed, there is ample evidence in the record that Defendant failed to perform by these dates.  For example, both Osborn and Mustian testified that, as of October 20, 2021, the date that Plaintiff terminated the agreement, it had not received a component set that could be integrated into a saleable firearm.  (Doc. 38-14, p. 3; doc. 38-1, p. 3.)  Additionally, in his sworn declaration, Vergakis testified that Plaintiff received fewer than 30 sets of upper and lower receivers during the entire course of the project, when PO #2 was for 2,100.  (Doc. 53-1, p. 1; <u>see</u> doc. 38-5.) Furthermore, Plaintiff is correct that Paragraph 6 of PO #2's terms and conditions authorized Plaintiff to "cancel this [PO] . . . if [Defendant] fails to deliver the [g]oods in accordance with any delivery or performance dates specified herein."  (Doc. 38-5, p. 106 (emphasis added).)  Similarly, under Georgia's UCC, a buyer may cancel "[w]here the seller fails to make delivery . . . or the buyer rightfully rejects . . . any goods involved."  O.C.G.A. § 11-2-711.

The problem with Plaintiff's argument, as Defendant points out, is that PO #2 does not contain precise "delivery" or "performance" dates.  Rather, it states, in precatory terms, the "*Desired Recv* Date" of each installment as June 28, July 28, and August 27, 2021, respectively. (Doc. 38-5, pp. 1–2.)  PO #2 does not specifically define any "delivery" or "performance" dates or indicate whether a "Desired Recv Date" qualifies as such.  (<u>See generally id.</u> at pp. 1–5.)  In the construction of contracts, "words . . . generally bear their usual and common meaning."  <u>Blue Cross & Blue Shield of Ga., Inc. v. Shirley</u>, 699 S.E.2d 616, 619 (Ga. Ct. App. 2010) (alteration in original).  To a layperson, a delivery date (which the Court shall assume is the same as a receipt date) is the date upon which goods are expected or required to be delivered, whereas a *desired* delivery date is the date upon which delivery is merely wanted or hoped for.  <u>See</u> *Desired*, Cambridge Dictionary ("That is wanted"); *Desire*, <u>Merriam Webster's Dictionary</u> ("[T]o want

something; to wish for something"); see also JM Holdings 1 LLC v. Quarters Holding GmbH, No. 20-CV-3480 (JPO), 2021 WL 860516, at *4 (S.D.N.Y. Mar. 8, 2021) (finding that a lease which contained an "Anticipated Delivery Date" did not "*require* the property to be delivered by a date certain." (emphasis added).  On the other hand, the fact that Paragraph 6 authorizes cancellation for failure to deliver in accordance with "*any* delivery or performance dates specified [in PO #2]" could reasonably be read to apply to "desired" receipt dates, as they arguably are a type of delivery or performance date.  (Doc. 38-5, p. 4.)  In light of these competing reasonable interpretations, the Court finds that PO #2's cancellation provision is ambiguous regarding whether Plaintiff was authorized to cancel if Defendant failed to deliver each installment by its corresponding "Desired Recv Date."

Under Georgia law, when a contract is ambiguous, the court applies the applicable rules of construction set forth in O.C.G.A. § 13-2-2 to ascertain the parties' intent, and if, after doing so, the provision is still ambiguous, the court resolves the ambiguity.  Empire Distribs., Inc. v. George L. Smith II Ga. World Cong. Ctr. Auth., 509 S.E.2d 650, 653 (Ga. Ct. App. 1998).  "[P]arol evidence is admissible to explain an ambiguity in a written contract, although such evidence is inadmissible to add to, take from, or vary the writing itself."  Id.; see Baker v. Jellibeans, Inc., 314 S.E.2d 874, 876 (Ga. 1984) ("[P]arol evidence is admissible to explain ambiguities and to aid in the construction of contracts.").  Moreover, "[u]nder the statutory rules of contract construction, if a contract is capable of being construed two ways, it will be construed against the preparer and in favor of the non-preparer."  Envision Printing, LLC v. Evans, 786 S.E.2d 250, 253 (Ga Ct. App. 2016) (citing O.C.G.A § 13-2-2(5)).  PO #1 is useful in construing PO #2 because, while both were produced using Plaintiff's standard form and both annex Plaintiff's standard terms and conditions, (compare doc. 37-4, pp. 98–102, with id. at pp. 103–07), there is one notable distinction between

them: whereas PO #2 contains "*Desired* Recv Date[s]" for each installment, (id. at pp. 103–04), PO #1 employs the term "*Required* Recv Date," (id. at pp. 98–99 (emphasis added)).   The difference in these terms strongly suggests that Plaintiff knew how to and could have set a precise deadline for each installment in PO #2 but opted instead to include merely a "desired" date of delivery.   Indeed, the presence of the word "desired" and the absence of the word "required" in PO #2 implies that the parties did not intend to allow Plaintiff to cancel PO #2 if Defendant failed to deliver an installment by the corresponding desired date.   Additionally, since PO #2 was created using Plaintiff's form and employs its "standard terms and conditions," the Court construes it in Defendant's favor, and finds that the current record does not establish that Plaintiff could cancel PO#2 simply upon Defendant's failure to deliver by the desired dates.

Moreover, even if the Court found that Plaintiff *did* have a right to cancel the contract, a reasonable jury could find that Plaintiff waived that right by continuing to request and assist with Defendant's performance thereafter.   "It is well established that a party to a contract may waive a contractual provision for his or her benefit."  Forsyth Cnty. v. Waterscape Servs., LLC, 694 S.E.2d 102, 109 (Ga. Ct. App. 2010).  Furthermore, "[a] protracted delay in failing to exercise an option to terminate can support an inference of waiver."  Id. at 110.  "The question whether the parties' mutual conduct caused a waiver . . . ordinarily is a question for the jury."  Kusuma v. Metametrix, Inc., 381 S.E.2d 322, 323 (Ga. Ct. App. 1989).  In this case, the record is replete with evidence that the parties were working together on the design of the PCC after the desired receipt date for the first two installments.  On July 8, nearly two weeks after the first desired date of receipt, Vergakis e-mailed Noriega asking him to review a Power Point containing photos and text and markers identifying various issues with the design and construction of certain components that had been delivered.  (Doc. 53-1, pp. 4–11.)  On July 19, Vergakis e-mailed Snyder stating, "Some

items in the PowerPoint were addressed and some were not.  So we'll put together another slide show of *what still needs to be addressed and send that out*."  (Id. at p. 12 (emphasis added).)  Then, on July 27, just one day before the desired date of receipt of the *second* installment of PO #2, Nicholson visited Defendant on Plaintiff's behalf to conduct a supplier survey.  (Doc. 46, p. 11; doc. 38-8, p. 7.)  Nicholson's e-mail to Snyder describing her objectives for the visit strongly indicates that Plaintiff perceived the project to be ongoing and anticipated that Defendant would continue performing in the future; Nicholson wrote that she intended to (1) "[o]bserve the actual incoming inspection for each of the parts *you are purchasing for our project*"; (2) "[o]bserve the actual in-process and final inspection for each of the parts you are *manufacturing*;" (3) "[d]iscuss your *plan* for packaging production parts"; and (4) "[g]o over our *expectations* as far as visual." (Doc. 37-4, p. 108 (emphasis added).)  Additionally, it is undisputed that Osborn accompanied Nicholson on the visit, remained for two full work weeks developing a new model for the firearm which could be manipulated, and made some cosmetic changes to the gun's exterior.  (Doc. 37-7, pp. 10–11.)  Osborn also testified that, "after leaving, [Defendant] [was] to give [Plaintiff] parts that functioned."  (Id. at p. 11; see doc. 37-5, p. 8 (Noriega confirming he sent Plaintiff "a couple samples" after he left).)

The forgoing facts could allow a reasonable jury to find that Plaintiff intentionally relinquished its right (assuming one even existed) to cancel PO #2 for failing to deliver the installments by the desired receipt dates.  See Forsyth Cnty., 694 S.E.2d at 109 ("Acting on the theory that the contract is still in force, as by continuing performance, demanding or urging further performance, or permitting the other party to perform and accepting[,] or retaining benefits under the contract, may constitute waiver of a breach.").  Put differently, a reasonable jury could conclude that Plaintiff waived any right to cancel based on Defendant's delayed performance by

working with Defendant to fix issues with the gun's design and by demanding further performance.[5]  Accordingly, summary judgment is not warranted on this basis.

## B.     Defendant's Argument that Plaintiff Terminated the Relationship Before December 1, 2021

Defendant requests summary judgment on Plaintiff's breach of contract claims on the ground that it would have performed all work required under PO #2 and would have delivered conforming goods by the modified deadline of December 1, 2021, if Plaintiff had not unilaterally terminated the contract.  (Doc. 37-1, pp. 7–8.)  Plaintiff responds that Defendant "cannot avail itself of any contingent, reduced purchase order due Dec[ember] 1, 2021, since it agreed no such agreement would exist unless it produced a working gun by Sept. 30, 2021," which it did not do. (Doc. 50, p. 7; see also doc. 45, p. 22 (contending that Defendant improperly "relies on a date from the contingent, cut-in-a-third *potential* purchase order the parties agreed to in their August 26, 2021[,] meeting") (emphasis added).)

As Plaintiff correctly notes, "[a]ll of [Defendant's] arguments seemingly hinge on an August 26, 2021[,] meeting between the parties," because that is where the modified deadline of December 1, 2021, originated.  (Doc. 45, p. 8.)  It is undisputed that the parties agreed during the August 26 meeting that Plaintiff "would be revising the original [PO #2] from 2100 units to 763 units due for delivery on [December 1, 2021]," on the condition that Defendant first deliver two

---

[5]  For the same reasons, the Court finds that there is a genuine dispute of fact as to whether Plaintiff waived its right to assert that time was of the essence by working with Defendant to fix the issues with the prototype's design well after the desired receipt dates for the first and second installments.  See Jackson v. L. S. Brown Co., 71 S.E.2d 521, 523 (Ga. Ct. App. 1952) ("Delay in the performance of a contract wherein time is made of the essence may be waived by the acceptance of the delayed performance."); id. ("Notwithstanding time is of the essence of the contract, it may be waived, and a subsequent offer to fulfill the contract, and urging a compliance on the other side, instead of treating the contract as at an end, amounts to a waiver.") (quoting Jordan v. Rhodes, 24 Ga. 478 (1858)).  Therefore, to the extent Plaintiff contends that summary judgment is warranted because of the time-is-of-the-essence provisions contained in PO #2 and the LOI, this argument fails.

fully functioning prototypes and ten complete component sets, along with test and inspection data, by September 30.  (Doc. 37-4, pp. 116–17.)  Crucially, the parties agreed that if Defendant failed to meet these "requirements and [the] schedule of deliveries," Plaintiff would "terminate its partnership with [Defendant] immediately."  (Id.; doc. 37-3, p. 29 (Snyder's testimony confirming that he agreed that if Defendant failed to deliver functioning prototypes by September 30 or failed to rule out intellectual property infringement, Plaintiff would terminate the parties' partnership).)  Plaintiff also "reserve[d] all rights as previously entered upon in the [LOI] . . . and under PO [#2], originally and as amended to 763 units," which included the right to cancel in Paragraph 6 of PO #2 and the LOI's reimbursement provision.  (Doc. 37-4, p. 117; see doc. 38-5, p. 4; doc. 38-6.)

The unrebutted facts show that Defendant did not meet the conditions agreed upon during the August 26, 2021, meeting.  Defendant has not pointed to any evidence that it delivered two fully functioning prototypes, ten complete component sets, and test data by September 30.[6]  The only evidence in the record that Defendant delivered *any* components to Plaintiff after August 26 is Osborn's testimony that Plaintiff received a component set from Defendant in September 2021 that purportedly would fix the existing problems with the PCC.  (Doc. 38-14, p. 2.)  Osborn testified that he tested the unit and that the LRBHO mechanism functioned only 13 times out of 40 attempts.  (Id. at pp. 2, 6–7.)  Furthermore, both Osborn and Mustian testified that Plaintiff did not receive any component sets from Defendant on or prior to October 20 that could be integrated into a saleable firearm, citing problems such as an easily bent/warped top plate, a bolt catch that over-traveled the follower in the magazine, and bolt-catch failure due to bending at the weld near the rear charging handle.  (Doc. 38-14, p. 3; doc. 38-1, p. 3.)  Furthermore, on October 20,

---

[6]  Plaintiff also contends that Defendant failed to sufficiently inquire into the potential intellectual property issues of the LRBHO that Defendant was purchasing from a third-party.  (See doc. 45, pp. 11–12.)  The Court need not decide this issue given Defendant's failure to point to any evidence that it satisfied the other conditions precedent.

approximately three weeks after the September 30 deadline, Snyder requested another 30 days "to get [Plaintiff] a working gun." (Doc. 38-15.) Snyder conceded during his deposition that, at this point, the LRBHO "wasn't working as intended," and he wanted to provide Plaintiff a gun with an LRBHO mechanism that worked 100% of the time. (Doc. 37-4, p. 16.) Consequently, per the parties' agreement on August 26, the December 1 modified (i.e., extended) deadline was not triggered.

Moreover, even if the modified deadline had been triggered, Defendant has not pointed to any evidence to support its contention that it could have manufactured and delivered 763 component sets by December 1. The only evidence in the record suggesting that it could have is Snyder's e-mail on October 20 stating, "Here are videos showing the PCC functioning perfectly with the new LRBHO plate." (Doc. 38-15.) These videos are not in the record, though, and, absent any indication that Defendant had resolved the manufacturing issues that had previously caused cosmetic issues with its parts (such as mismatched pieces and machine marks), no reasonable jury could conclude on the basis of this e-mail alone that Defendant would have fulfilled the order by December 1. Accordingly, summary judgment is not warranted in Defendant's favor on the grounds that it would have performed by that date.

## II.   Plaintiff's Claims for Fraud/ Fraudulent Inducement (Count II) and Negligent Misrepresentation (Count III)

Count II of the Amended Complaint alleges that Defendant, with the intent of inducing Plaintiff to work with Defendant, knowingly misrepresented that it possessed the capacity, resources, intellectual property, and technical ability to design, produce, and manufacture the parts needed for the component sets. (Doc. 36, pp. 7–8.) Count III, which is alleged in the alternative to Count II, asserts the same allegations as Count II, except that it contends that Defendant's misrepresentations were negligently, rather than knowingly, made. (Id. at pp. 9–10.) Plaintiff

requests summary judgment as to Count II, and Defendant requests summary judgment as to Counts II and III.

In order to establish a fraud or fraudulent inducement claim under Georgia law, a plaintiff must prove the following elements: "(1) false representation, (2) scienter, (3) intention to induce the plaintiff to act or to refrain from acting, (4) justifiable reliance, and (5) damages." Abbott v. HomEq Servicing, Inc., No. 2:09-CV-160-SSC, 2010 WL 11600980, at *6 (N.D. Ga. Sept. 13, 2010). Concerning the first element, "[a] promise made without a present intent to perform is a misrepresentation of a material fact and is sufficient to support a cause of action for fraud." Lumpkin v. Deventer N. Am. Inc., 672 S.E.2d 405, 408 (Ga. Ct. App. 2008). As for the claim of negligent misrepresentation, "the only real distinction between negligent misrepresentation and fraud is the absence of the element of knowledge of the falsity of the information disclosed." Holmes v. Grubman, 691 S.E.2d 196, 200 (Ga. 2010).

### A.      Plaintiff's Motion for Sanctions Requesting Summary Judgment Based upon Defendant's Discovery Violations (Doc. 39)

In its Motion for Sanctions, Plaintiff argues that Defendant "concealed additional evidence that it *knew* it lacked the ability to design and manufacture conforming units for [Plaintiff] when it accepted the purchase order and prepayment and signed the [LOI]," pointing specifically to evidence that Defendant was aware of "complaints from prior customers about similar problems." (Doc. 39, p. 7.) Plaintiff contends that the proper remedy for these discovery violations is an order prohibiting Defendant from opposing or defending against Plaintiff's fraud claims and granting summary judgment in its favor on Count II. (Id. at pp. 2–3; see doc. 38, p. 20.) Defendant concedes that its responses were "incorrect or incomplete." (Doc. 42, p. 4.) However, it argues that the sanctions Plaintiff requests are unduly severe and inappropriate because Plaintiff ignored its good faith attempt to resolve the discovery dispute without court intervention. (Id. at pp. 4–6.)

Defendant also contends that it has timely supplemented its responses, as required by Rule 26, because it served upon Plaintiff supplemental discovery responses in conjunction with its Response to the Motion for Sanctions.  (Id.)

Under Federal Rule of Civil Procedure 26(e), a party who has responded to an interrogatory must supplement or correct its disclosure or response "in a timely manner if the party learns that in some material respect the disclosure or response is incomplete or incorrect, and if the additional or corrective information has not otherwise been made known to the other parties during the discovery process or in writing."  Fed R. Civ. P. 26(e)(1).  The parties' discovery dispute centers around Defendant's response to Interrogatory 10 of Plaintiff's first set of interrogatories to Defendant, which asks if Defendant "ever received complaints from customers about any lower receiver assemblies, upper receivers, gas buffer tubes, and bolt carriers [it] supplied to those customers."  (Doc. 39-1, p. 6.)  On March 18, 2022, Defendant responded, "None."  (Id. at p. 10.)  However, the evidence shows that Defendant received at least three complaints about its lower receivers from clients in the twelve months prior to this response.  For example, according to the Declaration of Steve Winenger, a former customer of Defendant and the CEO of Ripcord Industries, Defendant's lower receivers were "manufactured incorrectly and poorly."  (Doc. 39-2, pp. 1–2.)  Winenger testifies in his Declaration that he complained to Defendant about these issues, including in a May 17, 2021, text message which stated, "I can't use any of these lowers," and provided a list of various issues, including that some were not "the same width as [the] uppers" and some had "terrible" engraving.  (Id.; see id. at p. 72.)  Another former customer, Drew Estell, also stated that Defendant had manufactured signature rifles with lower receivers that were "out of spec in a variety of ways," so much so that it rendered the units "[un]fit for sale and potentially dangerous."  (Doc. 39-3, p. 2.)  For example, Estell testified that "[t]he lines . . . did not match up

24

on the receivers, and the pins did not line up, so a user could only fit certain triggers in the firearm." (Id. at pp. 1–2.)  Estell testified that he communicated his concerns "about the low-quality lower receivers" to Defendant "at various points in 2021," and had his attorney send a cease-and-desist letter on October 29, 2021, demanding that Defendant stop selling the rifle.  (Id. at p. 2; see id. at pp. 3–4.)  Finally, on June 29, 2022, a company called 4Bush Weapons Refinishing Systems, LLC, ("4Bush") sued Defendant for breach of contract in the United States District Court for the Middle District of Tennessee, alleging, in pertinent part, that 271 of the 295 lower receivers it had received from Defendant were defective.  See 4Bush Weapons Refinishing Sys., LLC v. The Tactical Edge, LLC, No. 3:22-cv-495 (M.D. Tenn. June 29, 2022) (doc. 1 (complaint)).  A summons was issued as to Defendant that same day, id. (doc. 4), and Defendant filed an answer on July 20, 2022, id. (doc. 9).

According to Plaintiff's counsel's declaration, he did not learn of Winenger's existence until after discovery closed, and he notified Defendant's counsel about Winenger's complaints on September 21, 2022.  (Doc. 39-6, p. 1.)  Five days later, the parties submitted a Status Report which indicated that, "in discovery, . . . [Defendant] stated that it had received no complaints about the part at issue in this case, but a third party contacted [Plaintiff] after the close of discovery with information that could contradict that discovery statement."  (Doc. 33, pp. 1–2.)  The Status Report further provided that "[i]t is unclear whether the Court's intervention will be required, but Plaintiff will inform the Court if [it] intends to seek the Court's involvement."  (Id. at p. 2.)  The following day, Plaintiff e-mailed Defendant's counsel a copy of text messages that had been exchanged between Snyder and Winenger and additionally stated Plaintiff's intention to offer testimony from Estell about his complaints.  (Doc. 39-5, p. 2.)  Later that day, Defendant's counsel replied to the e-mail, explaining that Estell and Winenger had both signed non-disclosure agreements,

"preventing the disclosures that have already occurred [as well as] future disclosures," and indicating that Defendant "[would] be looking into pursuing claims against both of them."  (Id. at p. 1.)  Defendant's counsel also said, "Please let me know what you feel would be an appropriate way to address the matters with Ripcord and Drew Estell via supplementation or otherwise."  (Id. at p. 1.)  On September 29, the Court held a status conference with the parties and granted Plaintiff permission to file the at-issue Motion for Sanctions in accordance with the Court's Standard Procedures for Discovery Disputes.  (See docs. 34, 35); see Standard Procedures for Discovery Disputes and Settlement Conferences, United States District Court – Southern District of Georgia, https://www.gasd.uscourts.gov/sites/gasd/files/SOP-DiscoveryDisputesSettlementConferences-CLR.pdf. ("Before filing a discovery motion pursuant to [Rule] 37, a party must first receive permission from the Court following an informal telephonic discovery dispute conference."). According to Defendant, it served a supplemental response to Interrogatory 10 contemporaneously with its Response to Plaintiff's Motion for Sanctions.  (Doc. 42, p. 4.)

Defendant does not dispute that it received these complaints prior to answering Interrogatory 10, but rather contends that its response to this interrogatory was simply "incorrect or incomplete."  (Doc. 42, p. 4.)  It argues that it corrected this response and has complied with Rule 26 by serving upon Plaintiff a supplemental response to Interrogatory 10 which "provide[s] all known communications related to the third-party disputes."  (Id.)  Defendant contends that its supplementation is timely because "any delay . . . was caused by Plaintiff's failure to respond to [it] and resolve this matter cooperatively," and it needed time to "review the extensive materials already in Plaintiff's possession to determine if supplementation was even helpful and necessary or merely duplicative."  (Id. at pp. 4–5.)  Furthermore, Defendant contends that the sanctions Plaintiff seeks—prohibiting Defendant from asserting a defense and entering summary judgment

against it on Count II—are disproportionately severe because Defendant has not violated any

discovery order compelling disclosure, and Plaintiff was not prejudiced because it ultimately

received the information it wanted.[7]

### (1)   The Evidence Strongly Suggests that Defendant Misrepresented that it Had Not Received Prior Complaints

As a preliminary matter, Rule 26 provides that a party must "supplement or correct its . . .

response . . . in a timely manner if the party *learns* that in some material respect the . . . response

is incomplete or incorrect, and if the additional or corrective information has not otherwise been

made known." Fed. R. Civ. P. 26(e)(1) (emphasis added).  "The obligation to supplement arises

when the disclosing party reasonably should know that its prior discovery responses are

incomplete, e.g.[,] because the party has now obtained information it did not previously have."

Jama v. City & Cnty. of Denver, 304 F.R.D. 289, 299–300 (D. Colo. 2014).  Winenger and Estell's

unrebutted testimony is that they complained to Defendant throughout 2021 that the lower

receivers (and other components) were not functioning properly.  Indeed, Defendant received a

cease-and-desist letter from Estell's counsel on October 29, 2021, expressing concerns about its

failure to accord with Estell's specifications.  (Doc. 39-3, pp. 3–4.)  Notably, the letter indicates

that Estell "ha[d] become aware of other [of Defendant's] products not meeting specifications."

---

[7] Defendant also argues in a section of its Response—titled "Motion to Strike"—that Plaintiff failed to certify that it attempted to resolve this discovery dispute in good faith before asking the Court to intervene pursuant to Rule 37(a)(1). (Doc. 42, pp. 6–7.) Rule 37(a)(1) requires a party moving for an order to compel disclosure or discovery to certify that it has "in good faith conferred or attempted to confer with the person or party failing to make disclosure or discovery in an effort to obtain it without court action." Fed. R. Civ. P. 37(a)(1). However, Rule 37(a)(1)'s certification requirement is inapplicable here because Plaintiff moved for *sanctions*, not for an order to compel disclosure or discovery. See E.E.O.C. v. JP Morgan Chase Bank, N.A., 295 F.R.D. 166, 172 (S.D. Ohio 2013) (determining that Rule 37(a)(1)'s certification requirement was "inapplicable" because there "was no motion to compel at issue"). Additionally, the Court explicitly permitted Plaintiff to file the instant Motion for Sanctions during the parties' status conference on September 29, 2022, consistent with the Magistrate Judge's "Standard Procedures for Discovery Disputes and Settlement Conferences." (See docs. 34, 35.) Therefore, Defendant's purported "Motion to Strike" set forth in its Response is **DENIED**.

(Id. at p. 3.)  This evidence strongly suggests that Defendant did not merely "learn" that its response was inaccurate on September 21, 2022, when Plaintiff's counsel informed it about Winenger's prior complaints; rather, it indicates that Defendant was fully aware of these previous complaints when it made its initial interrogatory responses.  Accordingly, this would mean that Defendant affirmatively misrepresented that it had not received any complaints about its receivers and decided not to correct its response for months until Plaintiff discovered the information from a third party and moved for sanctions.

Even if the Court (somehow) found that Defendant did not interpret Winenger's and Estell's communications as "complaints" and genuinely believed, in good faith, that its initial response to Interrogatory 10 was complete and accurate, that belief was no longer reasonable after 4Bush sued it for breach of contract on June 29, 2022.  The complaint in that case explicitly states that 271 out of the 295 lower receivers it had received from Defendant were defective.  4Bush Weapons Refinishing Sys., No. 3:22-cv-495 (doc. 1).  The complaint also states that 4Bush had, prior to filing the complaint, "notified [Defendant] that 193 of the receivers were defective, to which 4Bush received no response."  Id.  Thus, at the *latest*, Defendant learned of complaints about its lower receivers when it was served in the 4Bush suit, and therefore was required by Rule 26(e) to supplement its response in a timely manner from that date.  Defendant concedes that it did not serve its supplemental response upon Plaintiff until October 26, 2022, in conjunction with its Response to the Motion for Sanctions.  (See doc. 42, p. 4.)  This was more than three months after it was served with the 4Bush suit and a month after it learned that Plaintiff had been notified of prior complaints by Winenger.

Defendant insists that its supplemental response was timely because Plaintiff did not respond to Defendant's inquiry on September 27, 2022, about how to proceed.  (Doc. 42, pp, 4–

5.)  Defendant contends it was confused regarding whether supplementation would be unnecessary or duplicative because Plaintiff had received the information it was looking for.  (Id.)  However, the evidence shows that Defendant knew about the 4Bush suit for at least *two months* before making this inquiry about how to proceed and that it had been notified of issues with its lower receivers as far back as March 2021 (some *six months* before making this inquiry).  Defendant, therefore, had already been subject to Rule 26(e)'s requirements for months when it sought "clarification," and Plaintiff cannot be blamed for Defendant's failure to comply with the rule. Moreover, Plaintiff's counsel testified that he "did not receive any supplementation . . . disclosing the existence of the 4Bush complaint even after the issues of the Winenger and Estell complaints were raised," (doc. 39-6, pp. 1–2), and there is no evidence suggesting that Defendant believed (or reasonably could have believed) that Plaintiff was aware of the 4Bush suit prior to Plaintiff's Motion for Sanctions.  Thus, Defendant could not reasonably have thought that alerting Plaintiff about that suit would have been "cumulative" or that it was excused from his duty to supplement under Rule 26.  See Fed. R. Civ. P 26(e)(1)(A) (excusing a party from supplementing an incomplete response only if "the additional or corrective information has . . . otherwise been made known to the other parties during the discovery process").  Defendant's attempts to shift the blame to Plaintiff fail.

In sum, the evidence shows that Defendant knew or reasonably should have known that its original response to Interrogatory 10 was inaccurate or incomplete and that it failed to supplement its response "in a timely manner" pursuant to Rule 26(e)(1)(A).

### (2)    The Proportionality of the Desired Sanctions

Plaintiff requests sanctions under Rule 37(c)(1), which provides that:

If a party fails to provide information or identify a witness as required by Rule 26 . . . (e), . . . the court, on motion and after giving an opportunity to be heard: (A) may

order payment of the reasonable expenses, including attorney's fees, caused by the failure; (B) may inform the jury of the party's failure; and (C) may impose other appropriate sanctions, including any of the orders listed in Rule 37(b)(2)(A)(i)–(vi).

Fed R. Civ. P. 37(c)(1).  According to Rule 37(b)(2)(A)(i)–(vi), such sanctions include an order:

(i)     directing that the matters embraced in the order or other designated facts be taken as established for purposes of the action, as the prevailing party claims;

(ii)    prohibiting the disobedient party from supporting or opposing designated claims or defenses, or from introducing designated matters in evidence;

(iii)   striking pleadings in whole or in part;

(iv)   staying further proceedings until the order is obeyed;

(v)    dismissing the action or proceeding in whole or in part; or

(vi)   rendering a default judgment against the disobedient party.

Fed. R. Civ. P. 37 (b)(2)(A)(i)–(vi).

In determining whether sanctions should be imposed under Rule 37(c), "courts typically consider the non-disclosing party's explanation, the importance of the evidence/disclosure, and the prejudice to the opposing party." Collins-Williams v. Contour Eastwyck LLC, No. 1:20-CV-3129-CAP, 2022 WL 17828934, at *105 (N.D. Ga. Dec. 15, 2022) (citing Calicchio v. Oasis Outsourcing Grp. Holdings, L.P., No. 21-12854, 2022 U.S. App. LEXIS 19538, at *3 (11th Cir. July 15, 2022)).

Taking these considerations in order, Defendant has not explained why it did not disclose Winenger or Estell's complaints in its original response or why it took months (and the filing of a motion for sanctions) to provide a supplemental response.  (See generally doc. 42.)  The closest Defendant has come is by stating that "any third-party 'complaints' were seemingly resolved satisfactorily and cooperatively." (Id. at p. 4.)  However, Defendant does not cite to any evidence for this statement, nor does it even contend that, because of the "satisfactor[y]" resolution, it

believed its response to be truthful.  In addition, Defendant, notably, has failed to even *mention* the 4Bush suit at any point—much less provide an explanation for why it never notified Plaintiff of that suit in a timely manner.  Furthermore, Defendant fails to offer any reason why it waited until Plaintiff raised the issue of Winenger's prior complaints instead of being proactive, which, absent an alternative explanation, suggests to the Court that Defendant was attempting to keep the prior complaints secret, particularly given that it apparently believed they were protected from third-party disclosure by non-disclosure agreements.  This cuts significantly towards imposing sanctions.

Concerning the second consideration, the Court finds that the prior complaints are relevant to Plaintiff's fraud claims.  "A promise made without a present intent to perform is a misrepresentation of a material fact and is sufficient to support a cause of action for fraud." Lumpkin, 672 S.E.2d at 408.  The fact that customers had complained about the quality and functionality of Defendant's lower receivers prior to and around the time Defendant accepted PO #2 could show that it lacked the present intent to perform or at least knowingly lacked the capacity to produce conforming component sets.  As Plaintiff argues, a jury could find that this evidence shows that Defendant "could not have believed it had the ability to deliver on the contract it signed on the timeline it promised," and, thus, misrepresented a material fact when it accepted PO #2. (Doc. 39, p. 14.)  Furthermore, evidence that Plaintiff had issues meeting specifications and deadlines in other projects may be relevant to show that Defendant's failure to deliver conforming goods on time to Plaintiff was not the result of changes Plaintiff purportedly requested after issuing PO #2.  This factor, therefore, also cuts in favor of sanctions.

As far as prejudice, the Court finds that Plaintiff suffered some prejudice due to Defendant's discovery misconduct.  Plaintiff did not learn of the prior complaints and the lawsuit

against Defendant stemming from issues with producing functional lower receivers for other customers until *after* the close of discovery.  Plaintiff was therefore unable to delve deeper into these complaints (and indeed, had no reason to consider it necessary to do so) during discovery, including when deposing Snyder and Noriega.

Nevertheless, the prejudice endured by Plaintiff is not so severe as to warrant the incredibly harsh sanctions it requests.  District courts have broad discretion to impose appropriate sanctions for discovery abuses.  <u>Phipps v. Blakeney</u>, 8 F.3d 788, 790 (11th Cir. 1993).  Plaintiff argues that the Court "should . . . prevent [Defendant] from defending against [its] fraud claim, rendering summary judgment on that claim appropriate."  (Doc. 39, p. 2; <u>see</u> doc. 38, p. 20 (stating that summary judgment is warranted "[g]iven that the Court should prohibit Defendant from defending the fraud claim").)  Plaintiff bases this request on Rule 37(b)(2)(A)(ii), which, as noted above, authorizes the Court to issue an order "prohibiting the disobedient party from supporting or opposing designated claims or defenses, or from introducing designated matters in evidence." Fed. R. Civ. P. 37(b)(2)(A)(ii).  Because Defendant appears to have intentionally concealed Winenger and Estell's prior complaints and, at the very least, failed to timely amend its incorrect response to Interrogatory 10, the Court prohibits Defendant from rebutting or introducing additional evidence concerning these complaints or the 4Bush lawsuit.  For the same reasons, Defendant also must, as it concedes would be "proportional," pay Plaintiff's costs incurred to prepare the Motion for Sanctions pursuant to Rule 37(c)(1)(A).  (Doc. 42, p. 6.)

The Court will not, however, prohibit Defendant from asserting *any* defense against Count II or grant summary judgment in Plaintiff's favor as a sanction.  Summary judgment is only appropriate where "the movant shows there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."  Fed R. Civ. P. 56(a).  An order granting

summary judgment is not permitted as a discovery sanction by Rule 37(b)(2)(A), nor is it authorized as a sanction elsewhere in the Rules.  To the extent Plaintiff is asking the Court to enter a default judgment as to Count II pursuant to Rule 37(b)(2)(A)(vi), this "severe sanction . . . is appropriate only as a last resort, when less drastic sanctions would not ensure compliance with the court's orders."  In re Sunshine Jr. Stores, Inc., 456 F.3d 1291, 1306 (11th Cir. 2006).  The Eleventh Circuit has held that "a default judgment sanction requires a willful or bad faith failure to obey a discovery order."  Malautea v. Suzuki Motor Co., 987 F.2d 1536, 1542 (11th Cir. 1993) (citing Societe Internationale pour Participations Industrielles et Commerciales v. Rogers, 357 U.S. 197, 212 (1958)).  In the instant case, while Defendant's failure to supplement its original response to notify Plaintiff of the 4Bush suit in a timely manner may have been willful, it did not violate any discovery order.  Additionally, although Plaintiff certainly was prejudiced, it discovered the prior complaints (albeit from Winenger, not Defendant) and the 4Bush suit in sufficient time to make arguments about them in its Partial Motion and to file its Motion for Sanctions.  Under the circumstances, the Court will not enter a default judgment on Count II, nor will it grant summary judgment by prohibiting Defendant from asserting a defense as to Count II.

In sum, the Court **GRANTS** Plaintiff's Motion for Sanctions to the extent it requests attorneys' fees and costs for the Motion for Sanctions and also to the extent it seeks to prohibit Defendant from opposing Plaintiff's claims that it received prior complaints about its lower receivers.[8]  However, the Court **DENIES** Plaintiff's request to prohibit Defendant from asserting *any* defense to Count II or to grant summary judgment as to Count II as a sanction.

### B.    Summary Judgment is Not Warranted in Either Party's Favor on Count II or Count III

---

[8] Specifically, the Court prohibits Defendant from rebutting or introducing additional evidence concerning Winenger and Estell's complaints or the 4Bush lawsuit.

Both parties request summary judgment as to Count II, and Defendant also requests summary judgment as to Count III.  (Doc. 37-1, pp. 8–10; doc. 38, pp. 19–22.)  Plaintiff contends that "[t]he record evidence . . . demonstrates both a promise without a present intent to perform and a misrepresentation about the status of the project to delay any request for repayment."  (Doc. 38, p. 21.)  According to Plaintiff, Defendant falsely represented its manufacturing capabilities in order to induce Plaintiff to send PO #2, and accepted PO #2 even though Noriega, Defendant's lead engineer, did not know how to design a firearm that conformed to Plaintiff's requirements.  (Id. at pp. 20–22.)  Plaintiff also contends that Defendant falsely represented that it had a functioning gun on September 2, 2021.  (Id. at p. 21.)  Defendant, on the other hand, argues that summary judgment is warranted in its favor on Counts II and III because Plaintiff has failed to point to any facts that it induced Plaintiff to hire it or that it misrepresented (either intentionally or negligently) its capabilities to perform its duties.  (Doc. 37-1, pp. 8–10.)  According to Defendant, its good faith and present intent/ability to perform are exemplified by the fact that it took extensive efforts to produce functioning parts prior to being paid, had produced its own PCC previously, and delivered a functioning prototype to Plaintiff at the beginning of the project.  (Id.)

The Court finds that there are genuine disputes of fact which preclude summary judgment in either party's favor as to Count II or Count III.  Plaintiff principally relies upon the testimony of Noriega, Defendant's chief engineer for the project, to show that Defendant accepted PO #2 despite knowing that it lacked the present intent or ability to perform.  (See generally doc. 38.)  Plaintiff focuses on Noriega's testimony that: (1) "it had become clear to [him] that it was going to be a difficult engineering problem to work with the PMAG by the time [he] realized [Plaintiff] was using PMAGs in January or February of 2021," (doc. 37-5, p. 11), and (2) "[b]efore July of 2021[,] . . . [he] didn't know that [he] had a viable solution for the PMAG problem yet," (id. at p.

19).  (Doc. 38, pp. 20–21.)  According to Plaintiff, Noriega's testimony clearly shows that "he did not know how to design a firearm that conformed to [Plaintiff's] requirements and would accept PMAGs when [Defendant] accepted the purchase order and payment."  (Id. at p. 20.)  Plaintiff also contends that Noriega's testimony shows that Defendant "knew it did not have the technical ability to timely deliver a working PCC" when it accepted PO #2 and Plaintiff's prepayment.  (Id. at p. 6.)  Plaintiff analogizes this case to Esprit Log & Timber Frame Homes, Inc. v. Wilcox, in which the Georgia Court of Appeals found that a jury could conclude that the defendant committed fraud because it "accepted the order with the knowledge that it could not deliver on its promise to deliver [the goods]."  691 S.E.2d 344, 348 (Ga. Ct. App. 2010).

Unlike in Esprit Log, however, nothing in this case, including in Noriega's testimony, conclusively shows that Defendant *knew* it could not ultimately perform when it accepted PO #2. To the contrary, it shows that Defendant was still working through the engineering issues caused by ensuring that the PCC was compatible with PMAGs.  According to Noriega, the engineering difficulties stemmed from the need to "open[] up" the weapon's "tolerance to accept the magazines that [Plaintiff] wanted," which caused a cascade of other, unforeseen issues, particularly with the LRBHO.  (Doc. 37-5, p. 9.)  Crucially, however, Noriega did *not* testify that he believed these challenges were insurmountable, or that, by the time Defendant accepted PO #2 in May 2021, he *knew* Defendant would not be able to resolve them by PO #2's desired receipt dates.  (See generally doc. 37-5.)  He merely admitted that he did not "*yet*" have a viable solution to an engineering problem with a custom firearm whose design/specifications, the record suggests, were still being finalized well after the parties entered PO #2.  (Id. at p. 19; see, e.g., id. at pp. 10, 15 (Noriega's testimony that, during Osborn's visit in late July 2021, Osborn wanted to "redo the whole model" and, moved the "true position of the magazine," which "threw everything off").)

Additionally, Plaintiff has not cited any testimony from Noriega—or from anyone else at Defendant—indicating that Defendant did not *intend* to perform.  Indeed, the record is replete with evidence to the contrary.  For example, in Vergakis' e-mail summarizing his visit to Defendant on April 29, 2021, he stated that Defendant informed him that it had rejected other work to support the project, built up its inventory to have machine time for Plaintiff, and that its machines were waiting on Plaintiff to confirm which types of rails were being used for the PCC.  (Doc. 37-4, p. 112.)  Vergakis observed that Defendant "seemed fully committed to making this happen and want us to be successful with this."  (Id.)  Moreover, it is undisputed that Defendant worked on the PCC project without a formal PO or payment for months.  (Doc. 46, pp. 6–7.)  Taken together, a jury could reasonably find that Defendant believed it could and would perform on the terms of the contract.  Accordingly, summary judgment is not warranted on the theory that Defendant accepted PO #2 with knowledge that it would not or could not perform.[9]

Next, Plaintiff cites the Power Point presentation made to Vergakis during his visit to Defendant on April 29, 2021, which stated that part of the "Project Plan" was to "[h]ave 500 units ready 30 days before deadline."  (Doc. 38-1, p. 13; see doc. 38, p. 21; doc. 38-4, p. 14.)  According to Plaintiff, this was a "blatant misrepresentation" designed to induce Plaintiff to give Defendant PO #2.  (Doc. 38, p. 21.)  In light of Noriega's testimony that, at this point, he lacked a solution to the PMAG issue, a reasonable jury could therefore find that Defendant misrepresented its production capabilities.  On the other hand, however, in Vergakis' e-mail summarizing his visit,

---

[9] To the extent that Plaintiff argues that the prior complaints Defendant received from Winenger and Estell (as well as those alleged in the 4Bush suit) establish that Defendant knew it lacked the ability to produce functioning lower receivers for Plaintiff, the Court disagrees.  (See doc. 38, pp. 21–22.)  The complaints were made by different customers, concerning different orders with their own unique specifications. Therefore, while they may be relevant to show Defendant's knowledge about its manufacturing capabilities generally, those complaints are insufficient to definitively show that Defendant knew that it could not fulfill PO #2 when it accepted the order.

he stated that the "[p]lan *as we discussed* . . . is to ship 700 units to [Plaintiff] no later than June 28th," and the email made no mention of any "plan" for Defendant to have 500 of those units ready before the deadline.  (Doc. 37-4, p. 112.)   Furthermore, Vergakis' e-mail identifies numerous questions about the design that *Plaintiff* needed to answer (such as the type of magazines Plaintiff intended to use) and parts that *Plaintiff* needed to supply in order for Defendant to proceed (such as barrels for test firing).  (Id. at pp. 111–12.)  A reasonable jury could therefore *also* find that when Plaintiff sent PO #2 approximately one week later, it did not expect (or could not reasonably have expected) that Defendant would have 500 units ready a month prior to June 28 and, thus, had not been induced to send PO #2 by the lone statement in the Power Point.  Indeed, it is notable that neither the LOI nor PO #2 contemplate or require that Defendant would have *any number* of units—much less 500 units—ready a month before any of the desired receipt dates listed in PO #2. (See generally docs. 38-5, 38-6.)  Accordingly, summary judgment is not warranted on the basis of the Power Point.[10]

In sum, while there are facts tending to show that Defendant accepted PO #2 despite its knowledge of certain engineering difficulties and despite a misstatement in the Power Point concerning its production capabilities, there is also evidence which demonstrates that Defendant believed in good faith that it could perform and also that any misrepresentation it may have made was not or could not have been reasonably relied upon by Plaintiff.  As such, a reasonable jury could conclude that Defendant made a representation that could support a fraud claim, but it also

---

[10]  To the extent that Plaintiff relies upon Snyder's September 2, 2021, e-mail stating that Defendant had a fully functioning gun, (see doc. 38, pp. 19–22; doc. 50, pp. 20–23), the Court declines to consider it.  Count II alleges that Defendant committed fraud by misrepresenting its capabilities to perform in order to *induce* Plaintiff to provide PO #2.  (Doc. 36, pp. 7–8.)  Therefore, this e-mail, which was sent months *after* Defendant accepted PO #2 and the parties executed the LOI, is inapposite.

could find to the contrary.  Accordingly, summary judgment is not warranted in either party's favor as to Count II or Count III.

## IV.     Defendant's Counterclaim for Breach of Contract

Count I of Defendant's Answer and Counterclaims alleges that Plaintiff "breach[ed] the express terms of the parties' [c]ontracts" by "intentionally fail[ing] and/or refus[ing] to pay the purchase price in full."  (Doc. 10, p. 10.)  Defendant argues that summary judgment is warranted on this counterclaim because it "delivered a substantial portion of the goods ahead of the modified delivery date of December 1, 2021," and "was prevented from delivering the remaining . . . component sets due to Plaintiff's breach of unilaterally cancelling the agreements."  (Doc. 37-1, p. 11.)  Defendant also appears to argue that Plaintiff accepted these component sets, failed to revoke its acceptance in a timely manner, and, thus, "reaccepted" the goods by exercising ownership and control over them.  (Id.)  Plaintiff, on the other hand, argues that it deserves summary judgment on the counterclaim for the same reason it provided regarding its breach of contract claim—it was entitled to cancel and recover pre-paid funds because Defendant failed to deliver the ordered goods by the dates specified in PO #2.  (Doc. 38, pp. 17–19, 23–24.)  Plaintiff also argues that it seasonably notified Defendant that the few sets of components it did receive were not conforming and were properly rejected, and that its safe-keeping of these rejected, defective goods does not constitute re-acceptance under Georgia law.  (Doc. 45, pp. 21–22.)  For the reasons below, summary judgment is warranted in Plaintiff's favor on Defendant's breach of contract counterclaim.

The Court has already found that Defendant failed to meet the conditions agreed upon during the August 21 meeting.  See Discussion Section I.B, supra.  Therefore, Plaintiff's decision to exercise its right to terminate its partnership with Defendant was not a "breach," as Defendant

contends.  Additionally, Defendant does not cite to any evidence to show that it "delivered a substantial portion of the goods," and there is unrebutted evidence indicating it did not do so.  (Doc. 37-1, p. 11.)  Specifically, Vergakis testified that Defendant sent Plaintiff fewer than 30 component sets of upper and lower receivers over the course of the project when PO #2 was for 2,100 sets. (Doc. 53-1, p. 1.)  Osborn additionally testified that Plaintiff did not receive any component sets on or prior to October 20 that could be integrated into a saleable firearm, citing problems such as "an easily bent/warped top plate, a bolt catch that over-traveled the follower in the magazine," and bolt-catch failure due to bending at the weld near the rear charging handle.  (Doc. 38-14, p. 3; <u>see also</u> doc. 38-1, p. 3 (Mustian's testimony that, "[a]s of October 20, 2021, [Plaintiff] had not received a single component set from [Defendant] that functioned adequately and that could be integrated into a saleable firearm").)  Defendant has failed to submit any evidence to rebut these assertions or otherwise put forth any evidence that it in fact delivered a substantial portion of the goods.

Next, Defendant's arguments concerning acceptance, failure to revoke acceptance, and re-acceptance also fail because the evidence shows that Plaintiff properly rejected the goods that were delivered to it.  Under Georgia law, a buyer must pay the contract price for any goods accepted. O.C.G.A. § 11-2-607(1).  Acceptance of goods occurs when the buyer: (a) after a reasonable opportunity to inspect them, signifies to the seller that the goods are conforming or that he will take or retain them despite their nonconformity; (b) fails to make an effective rejection under O.C.G.A. § 11-2-602 after the buyer had a reasonable opportunity to inspect them; or (c) does any act inconsistent with the seller's ownership.  O.C.G.A. § 11-2-606(1).  Under Section 11-2-602, a "[r]ejection of goods must be within a reasonable time after their delivery or tender" and is effective only if the buyer "seasonably notifies the seller."  O.C.G.A. § 11-2-602(1).

Defendant argues that Plaintiff accepted the goods by failing to make an effective rejection under Sections 11-2-606(1)(b) & (c).  (Doc. 37-1, p. 11; doc. 51, pp. 4–6.)  As a preliminary matter, it is unclear exactly which goods Defendant contends were accepted by Plaintiff.  Defendant does not refer to any specific deliveries in its Partial Motion, and instead refers broadly to its purported delivery of a "substantial portion" of the component sets.  (Doc. 37-1, p. 11.)  Defendant has likewise never explained or provided evidence documenting each of the deliveries it made to Plaintiff.  (See generally docs. 37-1, 51.)  Notwithstanding, the evidence establishes, for certain, that Plaintiff received some components from Defendant in July and in late September.  (See, e.g., doc. 53-1, p. 12 (e-mail from Vergakis to Snyder dated July 19, 2021, which states that Plaintiff "received the one upper and lower this morning"); doc. 38-14, p. 2 (Osborn's testimony that it received a component set in September 2021); doc. 53-2, p. 18 (timeline indicating that the "[s]econd complete PCC weapon arrived in the rifle configuration" on September 22).)  The undisputed evidence shows that Plaintiff unequivocally rejected these goods.  Specifically, on July 8, Vergakis e-mailed Noriega and stated, "Quality reviewed these parts this morning and added a couple more pictures that they would *reject these parts on* for production, please review the additional photos added to this [P]ower[ P]oint."  (Doc. 53-1, p. 4 (emphasis added); see id. at p. 5–11 (pictures with text and markers identifying various issues with firearm).)  Then, apparently after Defendant attempted to address the issues identified in the Power Point, Vergakis sent an e-mail to Snyder on July 19, 2021, stating, "Some items in the Power[ ]Point were addressed and some were not.  So we'll put together another slide show of *what still needs to be addressed* and send that out."  (Id. at p. 12 (emphasis added).)  Subsequently, with respect to the components delivered in late September, an e-mail dated September 27 indicates that Osborn sent Snyder a Power Point that described the following failures with the goods delivered that month: (1) "[t]he

bolt catch will over-travel the follower in the magazine" ("Failure #1"); (2) "[t]he bolt catch failure due to top plate bending" ("Failure #2"); and (3) "[t]he bolt catch failure due to bending at weld" ("Failure #3"). (Doc. 53-2, pp. 3–18.) Osborn's declaration confirms that he transmitted the Power Point to Defendant. (Id. at p. 1.) Moreover, Vergakis' declaration states that, in addition to written communications, Plaintiff held weekly video conference meetings with Defendant, in which Plaintiff's personnel informed Defendant that the latest component sets were nonconforming, were rejected, and could not be accepted. (Doc. 53-1, p. 1.) Defendant has not pointed to any evidence to refute that these conference calls occurred, and, indeed, Noriega even confirmed that the parties "had Zoom meetings every Monday pretty regularly." (Doc. 37-5, p. 16.)

In light of this evidence, Defendant's argument that it was not "seasonably notified of the rejection in terms that [it] could understand" as required by Section 11-2-602 fails. (Doc. 51, p. 5.) That leaves its argument that Plaintiff somehow "reaccepted" the goods by purportedly taking actions inconsistent with Defendant's ownership—namely, retaining possession of the items. The Court rejects this argument as well. Reacceptance occurs when "[a] buyer who purports to revoke his *acceptance* . . . performs acts which are inconsistent with the seller's ownership of the goods." Mitchell v. Backus Cadillac-Pontiac, Inc., 618 S.E.2d 87, 95 (Ga. Ct. App. 2005) (emphasis added); see Griffith v. Stovall Tire & Marine, Inc., 329 S.E.2d 234, 236 (Ga. Ct. App. 1985). As shown above, the undisputed evidence indicates that Plaintiff properly rejected the goods it received, and, as Plaintiff aptly states, Defendant "points to no communication demonstrating acceptance, nor . . . [does Defendant] point to any evidence rebutting [Plaintiff's] frequent and seasonable communication of rejection." (Doc. 45, p. 21.) The Court fails to see—and Defendant has not adequately explained—how items that have been properly rejected under O.C.G.A. § 11-2-602 could be deemed "re-accepted."

Moreover, even assuming Plaintiff *did* somehow accept the goods and *then* revoked that acceptance (i.e., rejected them), the record does not contain any evidence that Plaintiff took "acts which are inconsistent with [Defendant's] ownership of the goods." Mitchell, 618 S.E.2d at 94. To the contrary, it shows that Plaintiff merely held the rejected goods "with reasonable care . . . for a time sufficient to permit [Defendant] to remove them," which is all that was required of it. O.C.G.A. § 11-2-602(2). The sale or use of goods are the quintessential acts of ownership. See Deutz Corp. v. Engine Distribs., Inc., No. 1:21-CV-00288-SCJ, 2022 WL 18459536, at *6, n.13 (N.D. Ga. Sept. 20, 2022) ("[The] [d]efendant has . . . exercised ownership over [the] product by selling it to customers."); Imex Int'l, Inc. v. Wires EL, 583 S.E.2d 117, 123 (Ga Ct. App. 2003) ("[T]he continued use for a month . . . was inconsistent with rejection and was inconsistent with the seller's ownership of the goods."). Mustian testified that "[a]ny goods provided to [Plaintiff] have been held with reasonable care and . . . [Defendant] is permitted to remove them." (Doc. 38-1, p. 3.) He further testified that Plaintiff "has not used those parts commercially" or "modified them," and that, in fact, Defendant has never requested their return or instructed Plaintiff to deal with the goods in a certain way. (Doc. 50-1, p. 1.) Defendant has failed to point to any evidence which refutes this, or which suggests that Plaintiff sold or used any of the items after notifying Defendant of their defects. In fact, Defendant concedes that the goods are "unusable and unsellable" because they were "specially manufactured to [Plaintiff's] proprietary specifications." (Doc. 37-1, p. 13.) As such, summary judgment is not warranted in Defendant's favor on the basis that Plaintiff accepted or somehow reaccepted the defective goods by retaining possession of them.

In sum, because the undisputed evidence establishes that Plaintiff justifiably terminated the contract and that Plaintiff properly rejected the small number of defective components it received, Plaintiff is entitled to summary judgment as to Defendant's counterclaim for breach of contract.

IV.    **Defendant's Counterclaim for Intentional Misconduct**

Count II of Defendant's Answer and Counterclaims alleges that "Plaintiff is intentionally engaging in a scheme to fraudulently extract proprietary methods, formulae, designs, processes, and intellectual property from smaller businesses with which i[t] feigns a genuine interest in . . . [by] establishing a business relationship to gain such proprietary information without compensation." (Doc. 10, p. 11.)  Plaintiff argues that summary judgment is warranted on this counterclaim because there is no evidence that it engaged in predatory acts towards Defendant or any other small business, and Defendant bases its counterclaim on pure speculation. (Doc. 38, pp. 24–25.)  Plaintiff additionally points to evidence to show that it entered the relationship in good faith, including testimony that it wanted the relationship to work and the fact that it made over $300,000 in pre-payments to Defendant. (Id.)  The Court agrees that Defendant's counterclaim is unsupported by the evidence.

"Speculation[] [and] subjective opinions . . . do not support a claim for fraud." Next Century Commc'ns Corp. v. Ellis, 171 F. Supp. 2d 1374, 1380 (N.D. Ga. 2001) (collecting cases). "While fraud may be proved by slight circumstances, it must amount to more than mere speculation." Fann v. Mills, 546 S.E.2d 853, 858 (Ga. Ct. App. 2001).  The only evidence that Defendant cites in its Response is Snyder's testimony that, "[F]or a big part of this project it *seemed like* [Plaintiff] was just after the knowledge.  They didn't have any knowledge of this platform.  So they wanted us to give them all of the knowledge, all of our suppliers, all of our test data, all of this stuff.  And they never wanted to pay us." (Doc. 44, p. 14 (emphasis added) (quoting doc. 37-3, p. 19).)  Snyder's testimony is speculative, and no reasonable jury could conclude, based solely on this statement, that Plaintiff engaged in a fraudulent scheme to extract proprietary information or methods from Defendant.  Defendant has failed to support this theory by pointing to evidence

of any misrepresentations or other "intentional misconduct."  (See generally id.)  The closest Defendant comes is its statement that "the record . . . shows internal communications among Plaintiff's staff that the parties' partnership would only be temporary until Plaintiff began developing its own competing firearm."  (Id. at p. 14.)  However, Defendant failed to cite to these internal communications, and the Court is unsure what Defendant is referring to and unwilling to search through the record for support.  See United States v. Dunkel, 927 F.2d 955, 956 (7th Cir. 1991) ("Judges are not like pigs, hunting for truffles buried in briefs.").

Accordingly, absent any non-speculative evidence to rebut Plaintiff's evidence that it entered PO #2 in good faith, summary judgment in Plaintiff's favor is warranted on Defendant's vague counterclaim for intentional misconduct.  See Massey v. Seay, 570 S.E.2d 346, 348 (Ga. Ct. App. 2002) (affirming grant of summary judgment based on "highly speculative" nature of the record supporting the plaintiff's claim).

## V.     Defendant's Counterclaims for Punitive Damages and Attorneys' Fees

Plaintiff contends that summary judgment is warranted on Defendant's counterclaims for Punitive Damages and Attorneys' Fees (Counts III and IV, respectively, of Defendant's Answer and Counterclaims) because Defendant's substantive counterclaims fail.  The Court agrees.  "An award of attorney[s'] fees, costs, and punitive damages is derivative of a plaintiff's substantive claims."  Racette v. Bank of America, 733 S.E.2d 457, 466 (Ga. Ct. App. 2012).  Thus, because the Court has found that Plaintiff is entitled to summary judgment on Defendant's substantive counterclaims, see Discussion Sections III & IV, supra, summary judgment is also warranted on Defendant's counterclaims for attorneys' fees and punitive damages.  See Hobbs through Eagle v. Integrated Fire Prot., Inc., 850 S.E.2d 256, 267 (Ga. Ct. App. 2020) ("Because, as explained in the prior divisions of this opinion, [the defendant] was entitled to summary judgment on all of [the

plaintiff's] substantive claims, the trial court did not err in granting summary judgment to [the defendant] on [the plaintiff's] claims for attorney fees . . . and punitive damages.") (quoting <u>Home Depot U.S.A. v. Wabash Nat. Corp.</u>, 724 S.E.2d 53, 64–65 (Ga. Ct. App. 2012)); <u>Roofing Supply of Atlanta, Inc. v. Forrest Homes, Inc.</u>, 632 S.E.2d 161, 165 (2006) ("Because Forrest's claims for punitive damages and attorney fees would have been awardable only if Forrest had prevailed on its tort claims, they were properly dismissed as well.").

## CONCLUSION

Based upon the forgoing, the Court **GRANTS in part** and **DENIES in part** Plaintiff Daniel Defense LLC's Partial Motion for Summary Judgment.  (Doc. 38.)  Specifically, the Court **GRANTS** Plaintiff summary judgment on Defendant The Tactical Edge, LLC's counterclaims asserted in its Answer and Counterclaims, (<u>see</u> doc. 10).  The Court, however, **DENIES** Plaintiff's request for summary judgment as to its own breach of contract claim in Count I and its fraud/fraudulent inducement claim in Count II of its Amended Complaint.   (Doc. 38.) Additionally, the Court **GRANTS in part** and **DENIES in part** Plaintiff's Motion for Sanctions. (Doc. 39.)  Specifically, the Court finds that Plaintiff is entitled to sanctions under Rule 37(c)(1) for Defendant's failure to supplement its original response to Interrogatory 10 as required by Rule 26.   Accordingly, Defendant is prohibited from rebutting or introducing additional evidence concerning the complaints it received from Winenger and Estell, as well as the 4Bush lawsuit. Defendant also must pay Plaintiff's costs incurred to prepare the Motion for Sanctions.   However, the Court finds that an order prohibiting Defendant from asserting *any* defense to Count II of the Amended Complaint and/or granting summary judgment on that claim as a sanction is unduly severe under the circumstances.   The Court **ORDERS** Plaintiff to file, within **twenty-one (21) days**, a brief establishing the amount and scope of attorney's fees and costs requested, along with

appropriate, admissible evidentiary support for its requested fees and costs.  The Court further **ORDERS** Defendant to respond within **twenty-one (21) days** from Plaintiff's filing with any opposition.  Finally, the Court **DENIES** Defendant's Partial Motion for Summary Judgment. (Doc. 37.)

     **SO ORDERED**, this 9th day of June, 2023.

R. STAN BAKER
UNITED STATES DISTRICT JUDGE
SOUTHERN DISTRICT OF GEORGIA